James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Attorneys for Plaintiff
SECURITY POLICE AND FIRE
PROFESSIONALS OF AMERICA RETIREMENT FUND

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA RETIREMENT FUND, individually and on behalf of all other similarly situated stockholders, | Civil Action No. |
| Plaintiff, | |
| -v.- | **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |
| PFIZER, INC., as successor-in-interest to WYETH, a Delaware Corporation, ROBERT ESSNER, BERNARD POUSSOT, KENNETH J. MARTIN, GREG NORDEN, and ROBERT R. RUFFOLO, JR., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF CLAIMS ................................................................ 1

II.     PARTIES ........................................................................................ 6

    A.      THE PLAINTIFF ............................................................... 6

    B.      THE DEFENDANTS ......................................................... 6

III.    JURISDICTION AND VENUE ................................................... 10

IV.     FACTUAL BACKGROUND ....................................................... 11

    A.      WYETH, INC. .................................................................. 11

    B.      WYETH PARTNERS WITH ELAN TO DEVELOP AND SELL A NEW
            BLOCKBUSTER ALZHEIMER'S DRUG – B-MAB – "THE BIGGEST DRUG OF ALL
            TIME" ................................................................................ 13

    C.      WYETH MISLEADS INVESTORS WITH FALSE AND MISLEADING STATEMENTS,
            AND CONCEALS ITS KNOWLEDGE ABOUT PHASE 2 CLINICAL TRIAL
            RESULTS ............................................................................ 15

    D.      THE TRUTH IS FINALLY REVEALED ...................................... 17

V.      DEFENDANTS ACTED WITH SCIENTER ............................... 20

VI.     LOSS CAUSATION ...................................................................... 23

VII.    CLASS ACTION ALLEGATIONS ............................................. 25

VIII.   PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE ........... 26

IX.     NO SAFE HARBOR ..................................................................... 27

X.      CLAIMS FOR RELIEF ................................................................ 28

COUNT I
Violation of Section 10(B) of the Exchange Act and Rule 10(B)-5 Promulgated
Thereunder (Against All Defendants) .............................................................. 28

COUNT II
Violation Of Section 20(A) Of The Exchange Act
(Against The Individual Defendants ) ............................................................... 30

i

COUNT III
    Violations Of Section 20A Of The Exchange Act
    (Against Ruffolo and Martin) ........................................................................................... 33

PRAYER FOR RELIEF ......................................................................................................... 33

JURY TRIAL DEMAND ........................................................................................................ 35

Plaintiff Security Police and Fire Professionals of America Retirement Fund (hereafter, "SPFPARF" or "Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Wyeth ("Wyeth" or the "Company"), between May 21, 2007 and July 29, 2008, inclusive (the "Class Period"), by their undersigned attorneys, bring this action alleging fraud and violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") against Pfizer, Inc. ("Pfizer"), as successor-in-interest to Wyeth (now a wholly-owned operating subsidiary of Pfizer), Robert Essner, Bernard Poussot, Kenneth J. Martin, Greg Norden and Robert R. Ruffolo, Jr. (collectively, "Defendants").   The allegations against Defendants are based on personal knowledge as to Plaintiff's own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel, which included, among other things, a review of public statements, press releases, and SEC filings by Defendants; analyst and financial press reports; and other data and sources set forth below.  Plaintiff further believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF CLAIMS

1.      This is a securities fraud class action brought on behalf of all persons and entities who purchased or otherwise acquired Wyeth securities during the Class Period, asserting claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) 78t-1, 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2.      This action alleges that Defendants concealed material information and made false and misleading statements relating to Wyeth's most important pipeline drug, bapineuzumab, also known as AAB-001 (hereafter, "B-Mab"), which had the effect of artificially inflating the price of Wyeth securities during the Class Period.   In particular,

1

Defendants improperly touted the success of clinical trial results relating to the safety and efficacy of B-Mab -- a potential billion-dollar-a-year Alzheimer's drug -- even though they had seen the preliminary results, and thus had knowledge that the trial was an abject failure, missing all clinical endpoints and demonstrating serious safety concerns.

3.     Before its acquisition by Pfizer, Wyeth was the world's fourth largest pharmaceutical company.  Developing and commercializing B-Mab was a joint effort between Wyeth and Elan Corporation, plc ("Elan"), a neuroscience-based biotechnology company, domiciled in Ireland.  Both Wyeth and Elan had bet hundreds of millions of dollars on B-Mab's success, most of which was poured into costly clinical research and development programs.

4.     Wyeth's heavy investment in B-Mab was believed to be money well spent because of the enormous potential for any safe and effective treatment for Alzheimer's disease. According to an article appearing in *Barron's* in April 2008, B-Mab was perceived by analysts as having the potential to be the biggest drug of all-time -- even surpassing Lipitor's $13 billion blockbuster status -- because of the massive size and continued growth of the largely untreated and (to date) untreatable Alzheimer's population.

5.     Achieving this substantial success, however, hinged on FDA approval which, in turn, hinged on B-Mab's successful performance in clinical trials proving the drug was safe and effective for use.  Wyeth, and its partner Elan, planned to conduct Phase 2 and Phase 3 clinical trials to give the FDA the proof it needed for fast track approval.

6.     In April 2005, Defendants commenced enrollment in the Phase 2 clinical trial, testing B-Mab vs. placebo in 240 patients.  At that time, Wyeth and Elan agreed that they would conduct an "interim review" of the preliminary Phase 2 results, before the study was complete, in order to determine whether or not to proceed with Phase 3 testing, which typically involves

larger study populations (usually 300 to 2000 patients) and a longer duration of time undergoing treatment. Phase 3 testing also requires massive capital expenditures, and so pharmaceutical company's, like Wyeth, are typically cautious when moving ahead with expanded Phase 3 testing unless they have comfort that Phase 2 testing shows good results.

7.       In late 2006 and early 2007, before what would be the Class Period, Wyeth publicly represented that it might proceed to Phase 3 clinical testing of B-Mab in the first half of 2007, but only if the results of the planned interim look at the Phase 2 data satisfied certain "very specific criteria" relating to "four different clinical endpoints [objectives] to the trial, cognition, memory, quality of life and imaging." If B-Mab met those criteria, the interim-look at Phase 2 data -- according to the Company -- would be considered "*spectacular*," "*strong*," and "*very meaningful*." Wyeth represented that it would not move forward to Phase 3 testing on the basis of merely "circumstantial evidence of efficacy." In other words, they led the investing public to believe that they would proceed to early Phase 3 testing only in the highly particularized circumstance that the Phase 2 interim look demonstrated that the study endpoints for safety and efficacy were being met.

8.       On May 21, 2007, Wyeth announced that it and Elan were proceeding to Phase 3 testing, but declined to reveal any information concerning the results of their interim look at the Phase 2 data. As would only be revealed later, Wyeth failed to disclose that they were proceeding to Phase 3 in the absence of any supporting data that satisfied the Companies' "very specific criteria" -- the prerequisites to Phase 3 testing they had identified only months before.

9.       As the reaction of the market made clear, investors believed strongly that Wyeth's move to Phase 3 testing meant that Phase 2 was a success and that the Company's publicly announced prerequisites to moving on to Phase 3 testing had been satisfied. According to a

Davy Research analyst report issued on May 21: "No data have been disclosed, *but both companies previously outlined that results from the Phase [2] interim analyses would need to be 'spectacular' to proceed [to Phase 3]*."   In the wake of the Company's May 21, 2007 announcement, Wyeth's stock price rose 4% in one day on heavy trading volume of over 28 million shares to close at $58.41.  Elan's American Depository Receipts rose 12.5%.

      10.     Wyeth did not disclose that the Phase 2 clinical testing results that it saw during its "sneak peek" at the interim data were, in fact, abysmal.  Wyeth knew that the Phase 2 trial results showed that for all clinical endpoints, B-Mab was no more effective than a placebo in treating Alzheimer's.  The results, moreover, also showed a host of other problems.  For example, higher doses of the drug posed health risks (they were associated with vasogenic edema, a dangerous accumulation of fluid in the brain), and a number of patients taking the drug suffered "micro-bleeds" in their brains, while no patients on placebo suffered similar symptoms.  Three patients in the B-Mab test group died, compared to none in the placebo group.  Further, the drug showed no dose response, meaning higher doses of the drug were not associated with better results.  This suggested that any slight advantage of B-Mab over placebo could have been due to chance.

      11.     Defendants were highly motivated to conceal, and did conceal, these Phase 2 results from the public for as long as possible.  As analysts and investors digested Wyeth's decision to proceed to Phase 3 testing, Wyeth's stock price was on the rise -- something that it struggled to achieve for some time.  The May 2007 disclosure of Wyeth's decision to move forward with Phase 3 testing pushed Wyeth's stock price above $58 per share, a level not seen since May 2002.  Certain executive officer defendants exercised and sold valuable stock options

during the price run-up on Wyeth securities when material information was concealed from the market.

12.     Defendants were also motivated to conceal Phase 2 results and interim data for other reasons.  First, the Company had commenced merger discussions with Pfizer that it wanted to advance and preserve, and B-Mab's potential was believed to be the key driver of Wyeth's future potential and value.  A rising stock price and a belief in B-Mab's commercial potential would undoubtedly be the centerpiece in any price negotiation with Pfizer involving control of Wyeth.  Second, Defendants needed to enroll patients in the Phase 3 B-Mab study as quickly as possible, and disclosing the poor performance of B-Mab in Phase 2 testing would have significantly impeded Phase 3 enrollment.  Physicians were much less likely to enroll a patient into an experimental drug trial when prior trials showed little or no efficacy and/or serious safety concerns.  Thus, Defendants concealed that B-Mab appeared to be a failure and instead led everyone to believe that the Phase 2 clinical trial results for B-Mab were strong and spectacular.

13.     On June 17, 2008, Wyeth and Elan issued a joint press release which for the first time mentioned the Phase 2 study results.  In the release, Wyeth touted the supposedly *positive results* of the Phase 2 trial, but continued to conceal the full, negative results from the public for more than a month.  The June 17, 2008 release stated that Phase 2 preliminary findings were "encouraging" and that B-Mab "appeared to have clinical activity in treating Alzheimer's disease."  The release further stated that the Phase 2 preliminary analysis provided "continued validation" for B-Mab's mechanism of action, which was an "important milestone" to bring this new treatment option to patients.  According to the companies, the Phase 2 preliminary results "clinically support our decision to move into Phase 3 last year."  While the June 17th release also commented on certain safety and efficacy misses in the Phase 2 testing, investor sentiment was

5

buoyed by the positive (and misleading) spin put on the Phase 2 results, and Wyeth's stock went up 4.83% (or $2.08) to close at $45.16.  Investors would have to wait more than month for the release of the full results as opposed the Company's partial, *post hoc* analysis.

14.     On July 29, 2008, the full results of the Phase 2 trial were finally disclosed at a widely attended medical conference.  Investors then learned for the first time about true limits of B-Mab's efficacy, its many troublesome side effects, and the complete lack of dose response.  As one analyst stated, "[E]nough information was revealed to suggest that the Phase [2] results could be completely invalid."  On this news, Wyeth's stock price declined 11.9% in a single day (from $45.11 to $39.74, or $5.37) -- the largest single day drop in six years of trading -- on extremely heavy volume of over 55 million shares.  In this one trading day, Wyeth's market cap declined by over $7 billion.

## II.     PARTIES

### A.     THE PLAINTIFF

15.     Plaintiff Security Police and Fire Professionals of America Retirement Fund (hereafter, "SPFPARF" or "Plaintiff") is a union retirement and pension fund headquartered at 25510 Kelly Road, Roseville, Michigan, 48066.  SPFPARF represents over 27,000 members, and made purchases of Wyeth securities during the Class Period.

### B.     THE DEFENDANTS

16.     Defendant Pfizer, Inc. (NYSE: PFE) is the world's largest pharmaceutical company, ranking number one in sales in the world, and generating over $46 billion in revenues. Pfizer is a Delaware corporation headquartered in New York City, with its research headquarters in Groton, Connecticut, and local offices at 5 Giralda Farms, Madison, New Jersey.  It produces Lipitor (atorvastatin, used to lower blood cholesterol); the neuropathic pain/fibromyalgia drug Lyrica (pregabalin); the oral antifungal medication Diflucan (fluconazole), the antibiotic

Zithromax (azithromycin), Viagra (sildenafil) for erectile dysfunction, and the anti-inflammatory Celebrex (celecoxib). On January 26, 2009, Pfizer agreed to buy Wyeth for $68 billion, a deal financed with cash, shares and loans. The deal was completed on October 15, 2009, making Wyeth a wholly-owned subsidiary of Pfizer.

17.     Prior to its acquisition by Pfizer, Defendant Wyeth (formerly NYSE: WYE) had grown into the fourth largest biotech and pharmaceutical company with sales of $22.3 billion. Wyeth was organized in 1926 as a Delaware corporation with its headquartered in Madison, New Jersey.  Wyeth, now a wholly owned subsidiary of Pfizer, develops and markets traditional pharmaceuticals, vaccines, and biotechnology products that serve both human and animal health care, with its strongest product lines in both prescription medications and in consumer health products, including well-known over-the-counter (OTC) medications such as Centrum, Robitussin, Advil, and ChapStik. Prior to its acquisition by Pfizer, Wyeth marketed its products in more than 140 countries with manufacturing facilities on five continents.

18.     Defendant  Robert Essner ("Essner") was a Wyeth Director from 1997 to June 2008, and Chairman from January 2003 to June 2008. He served as Chief Executive Officer ("CEO") of Wyeth from May 2001 through December 2007, and was President from July 2000 until April 2006. Previously, Essner held the positions of Executive Vice President of Wyeth from September 1997 to July 2000, and Chief Operating Officer ("COO") from July 2000 to May 2001.

19.     Defendant Bernard Poussot ("Poussot") was a Director of Wyeth from January 2007 to October 2009 (when the Wyeth/Pfizer merger was consummated), and was CEO from January 2008 through October 2009. He served as President from April 2006 to October 2009, and was COO from January 2007 through December 2007. Poussot was Vice Chairman of

Wyeth from April 2006 through December 2007, and was Chairman from June 27, 2008 until October 2009.  From June 2002 to April 2006, he was Executive Vice President of Wyeth and President of Wyeth Pharmaceuticals, Inc.

20.     Defendant Kenneth J. Martin ("Martin") joined Wyeth in 1984 and served as CFO and Vice Chairman from 2000 though June 2007.  In 2000, he was also appointed Executive Vice President.  Martin retired in June 2007 to "pursue personal interests."

21.     Defendant Greg Norden ("Norden") was Senior Vice President and Chief Financial Officer of Wyeth from June 2007 through October 2009.  Previously, from October 2000 to June 2007, he served as Executive Vice President of Wyeth Pharmaceuticals, Inc.

22.     Defendant Robert R. Ruffolo, Jr., Ph.D. ("Ruffolo") joined Wyeth in November 2000 and was President, Wyeth Research and Senior Vice President, Wyeth, during the relevant period, retiring from those posts in late 2008.  Ruffolo was responsible for all pharmaceutical research and development ("R&D") for the Company, including discovery, drug safety and metabolism, chemical and pharmaceutical development, clinical R&D and research operations. According to Poussot, Ruffolo "has helped position our company for future growth through robust research and development programs in oncology, women's health, vaccines, inflammation, cardiovascular and metabolic diseases and neuroscience -- led by our multi-platform effort in Alzheimer's."  Prior to assuming his positions at Wyeth in 2000, Ruffolo was employed at SmithKline Beecham.

23.     Defendants Essner, Poussot, Martin, Norden, and Ruffolo are herein referred to as the "Individual Defendants."  During the Class Period, the Individual Defendants, by virtue of their senior executive positions at Wyeth, were privy to confidential and proprietary information concerning Wyeth, its operations, finances, financial condition, and present and future business

prospects relating to B-Mab.  The Individual Defendants also had access to materially adverse non-public information concerning B-Mab, as discussed in detail below, through their unfettered access to confidential corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided directly to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly and indirectly, control the conduct of Wyeth's business and its market disclosures.

25.    The Individual Defendants, because of their high-ranking positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, press releases, analyst meeting materials alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

9

26.     As senior executives and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Wyeth's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, including all material information relating to the Company's most commercially important pipeline drug, B-Mab.  The Individual Defendants also had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Wyeth's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Wyeth's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts concerning B-Mab.  The scheme: (i) deceived the investing public regarding the results of the Phase 2 B-Mab trial, leading investors to believe that the results were "strong" and "spectacular" when they were in fact abysmal, and the business, operations and management and intrinsic value of Wyeth's securities; and (ii) caused Plaintiff and members of the Class to purchase Wyeth's common stock at artificially inflated prices, which declined dramatically when the truth was disclosed.

## III.    JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t-1, 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

31.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.     FACTUAL BACKGROUND

### A.     WYETH, INC.

32.     Wyeth was organized in 1926 as a Delaware corporation and, prior to its acquisition by Pfizer in October 2009, maintained its headquarters in Madison, New Jersey. During the 1990s, Wyeth -- which at the time was called American Home Products Corporation ("AHP") -- began selling off the wide-ranging businesses it had acquired over the years in order to focus on pharmaceuticals.  In March 2002, the Company changed its name from AHP to Wyeth.  Wyeth is now a wholly-owned operating subsidiary of Pfizer.

33.     Prior to its acquisition by Pfizer, Wyeth had grown into the fourth largest biotech and pharmaceutical company with sales of $22.3 billion, and boasted that it was "one of the world's largest research driven pharmaceutical and health care product companies, with leading products in the areas of women's health care, infectious diseases, gastrointestinal health, central nervous system, inflammation, transplantation, oncology, vaccines and nutritional products."

34.     By 2007, in the prescription drug arena, Wyeth was best known for manufacturing the gastrointestinal reflux disease treatment Protonix ($1.9 billion in annual sales) and the antidepressant Effexor (over $3 billion in annual sales).  Effexor and Protonix accounted for over

a quarter of Wyeth's sales in 2007.  Wyeth's Effexor and Protonix patents were set to expire in 2010, but by early 2008 both were already under attack.   In December 2007, well-known generics manufacturer Teva Pharmaceuticals, Inc. ("Teva"), made an at-risk launch of generic Protonix, causing Wyeth's U.S. sales to drop by 58%.  The patent on Effexor's active ingredient (venlafaxine) ran out in 2008 (with Wyeth still holding patent on the capsule form until 2010) and Sun Pharmaceuticals, an Indian generics manufacturer, sought FDA approval for a generic version with the same active ingredient in tablet form.  As a result of these generic threats, Wyeth's revenues took a severe hit.

35.     At the same time that Wyeth was struggling with these important patent issues, it was suffering significant losses on other fronts.  By 2007, Wyeth was just emerging battered from massive litigation relating to two of its ill-fated diet drugs, Redux and Pondimin (part of the "fen-phen" craze of the late 1990s).  That litigation dragged on for a decade and cost Wyeth a stunning $21 billion.

36.     In addition, in 2007, Wyeth had widely publicized failures with New Drug Applications before the the Food and Drug Administration (FDA).  The FDA rejected Wyeth's osteoporosis drug, bazedoxifene, because of stroke and blood clot problems; rejected its schizophrenia drug, bifeprunox, because it was not as effective as other drugs on the market; and rejected its menopause drug, Pristiq, because of serious heart or liver complications experienced by trial participants.

37.     Not surprisingly, by 2007, Wyeth stock price was under severe pressure from the onslaught of bad news.  As reported by *Barron's* in April 2008, Wyeth stock price had declined sharply from a yearly high of $62 per share to trade at a lackluster $42, despite the considerable

attributes of the Company, including specifically the potential blockbuster Alzheimer's drug in its pipeline, B-Mab.

38.     Wyeth needed some good news, or at least was strongly motivated to avoid more bad news, and so it touted B-Mab as its primary success story, falsely portraying B-Mab as its most important pipeline drug with far more promise and potential than it knew B-Mab had.  At the invitation of the Company, Analysts and financial commentators were intently focused on any news relating to B-Mab both before and during the Class Period.

**B.**     **WYETH PARTNERS WITH ELAN TO DEVELOP AND SELL A NEW BLOCKBUSTER ALZHEIMER'S DRUG – B-MAB – "THE BIGGEST DRUG OF ALL TIME"**

39.     Wyeth and Elan began their partnership to develop, market and sell B-Mab in April 2000.  They formed the Wyeth and Elan Alzheimer's Immunotherapy Program ("AIP") which was a 50/50 collaboration to research, develop, and commercialize an immunotherapeutic approach that to treat mild-to-moderate Alzheimer's disease and possibly for preventing disease onset.  The collaboration included investigational clinical trial programs for B-Mab.

40.     AIP's research and clinical testing focused on what is known as the "beta amyloid hypothesis."  Essentially, this idea says that aberrant protein clumps called "amyloid plaques" in the brains of Alzheimer's patients are one of the major causes of the diseases.  Breaking up or clearing these clumps from the brain, with antibodies such as B-Mab, was hoped to stave off dementia, prevent disease onset or progression, and possibly lead to a cure.  The four Alzheimer's drugs currently available on the market just ease symptoms and many question their efficacy.  B-Mab was believed to be a game changer because its mechanism of action was thought to attack the root cause of Alzheimer's, making it a first line treatment for all those presenting symptoms or suffering from the disease.

41.     The beta amyloid hypothesis has never been proven and some scientific critics cited in *Forbes* believe that the plaques "are either irrelevant or even possibly a defensive reaction by brain tissue to the disease's neural assault."  Nevertheless, developing safe and effective amyloid inhibitors had shown promise, so much so that drug companies (including Eli Lilly and Pfizer, among others) have steadily poured hundreds of millions of dollars into research, development, and testing.

42.     Betting huge sums on proving the beta amyloid hypothesis was thought to be worth the risk because of the enormity of the illness.  According to the Alzheimer's Association (alz.org), there are more than 5 million Americans living with Alzheimer's disease, and more than 26 million worldwide.  The prevalence of the disease is on the rise.  The direct and indirect costs of Alzheimer's and other dementias amounted to more than $144 billion per year in the United States alone.  It is the fifth leading cause of death for those over age 65, and no truly effective pharmacological treatment exists.

43.     Wyeth and Elan's AIP was thought to be well ahead of the competition in getting to market an amyloid inhibitor, largely because of B-Mab.

44.     Analyst and investor sentiment on Wyeth's intrinsic value and future potential was buoyed by the promise of B-Mab, and Wyeth regularly fanned the flames, touting B-Mab as its most important pipeline drug.  Analysts and investors properly surmised that given the size of the largely untreated Alzheimer's market, the first safe and effective drug to combat the disease would command a hefty price premium and would quickly generate billions of dollars in sales. By 2007, the market consensus was that B-Mab was far and away the amyloid inhibitor most advanced in the quest for FDA approval.  Analysts at Decision Resources predicted that if B-Mab progressed along to road to approval as expected, it would be an $8.8 billion dollar drug by

14

2016, and by that time would be generating $5 billion per year.  Larry Feinberg, President of Greenwich-based Oracle Investment Management, believed that B-Mab could "become the biggest drug of all time" -- even surpassing Pfizer's $13 billion haul from its Lipitor sales -- if it were to deliver on its promise of altering the course of the disease.

45.     AIP had been engineering and re-engineering its amyloid inhibitors, and after producing good results in mice with B-Mab, it commenced a tiny Phase 1 study which, according to the companies, resulted in mental improvement in patients given moderate doses of B-Mab.  AIP then began Phase 2 testing with 180 patients in 2005, and expanded it to 240 patients in 2006.

46.     In October 2006, Defendant Ruffolo, Wyeth's Head of R&D, publicly announced that Wyeth would take an "interim" peek at the Phase 2 study to determine whether to complete the study as planned, or if the results merited, to proceed even before the Phase 2 study was complete to launch a Phase 3 trial.  For Wyeth to fast track its Phase 3 study, Ruffolo cautioned, "results would have to be spectacular."

47.     According to the companies, the Phase 2 data would have to satisfy "very specific criteria" relating to "four different clinical endpoints [objectives] to the trial, cognition, memory, quality of life and imaging."  Seven months later, and after the AIP's interim peek at the data, the Company announced that it was launching Phase 3 testing, strongly signaling to investors that the Phase 2 results were "spectacular" and that the Phase 2 endpoints for safety and efficacy were being met.

C.     WYETH MISLEADS INVESTORS WITH FALSE AND MISLEADING STATEMENTS, AND CONCEALS ITS KNOWLEDGE ABOUT PHASE 2 CLINICAL TRIAL RESULTS

48.     On May 21, 2007 (the start of the proposed Class Period), Wyeth announced that it and Elan were proceeding to Phase 3 testing, but declined to reveal any information concerning

the results of their interim look at the Phase 2 data.  Instead, throughout the Class Period, Wyeth and the AIP continued to encourage the investing public to believe that B-Mab had satisfied the companies' publicly announced, stringent requirements for proceeding to Phase 3 clinical testing, while falsely referencing the "spectacular" results of the Phase 2 trial that it had seen but were yet to be released.

49.     For example, on July 26, 2007, approximately two months after the companies announced their decision to commence early Phase 3 testing, the companies cited the interim look at Phase 2 data as a seminal basis for moving forward with Phase 3.  According to the companies: "The decision to move into Phase III was based on the totality of what the companies have learned from our Alzheimer's immunotherapy programs, *including the scheduled interim look at data from our ongoing Phase II study*. . . ." (emphasis added).  Five days later, on July 31, 2007, Natixis Bleichroeder published an analyst report reflecting the market's general (mis)understanding of the message the companies' were communicating: "We think the data at the interim look must have been profound and possibly involved a continual separation of drug from placebo over time – indicative of true disease modification."

50.     Similarly, during a presentation on May 1, 2008, *after* the Phase 2 study was completed, the companies continued to use the word "spectacular" -- a word the market had long remembered since its first use by Ruffolo in 2006 -- stating that there continued to be "some *probability*" that "*spectacular*" Phase 2 data could create a "*regulatory pathway to a filing that would be earlier than a full normal completion of Phase III*." (emphasis added).  During the same presentation, the companies skirted questions about the specific results of the Phase 2 interim review, while prompting the market to assume the very best about that data: "*once you see the Phase II data, the marketplace and the investigators, the clinicians and everyone else*

16

*who wants to look at it would say, geez, I understand exactly why Wyeth and Elan started a Phase III [clinical trial when] they did*." (emphasis added).  The companies stated, further:

> So, without answering that specifically, I think it will be – *it should be obvious why we moved to Phase III* and I think that whether its statistical significance in all or parts, supported by trends, or trends with different combinations of data points. I think that the reason we moved to Phase III was *we clearly saw enough data to move forward. It's a huge decision for us, and for Wyeth and [it's] one that we don't take lightly.* (emphasis added).

### D.  THE TRUTH IS FINALLY REVEALED

51.  The market remained under the illusion of exceptional prospects for B-Mab -- creating an artificially inflated Wyeth stock price -- upon Wyeth's selective release of purportedly *positive news* from the Phase 2 testing on June 17, 2008, until the companies' released the full results on July 29, 2008.

52.  Wyeth and Elan were obviously loathe to admit the disappointing final results of the Phase 2 clinical trial for a number of reasons.  The much larger, 4000+ patient, Phase 3 study was still enrolling, and any negative news about B-Mab would delay the companies' completion of the expensive study, and the possible approval of the drug and the revenues that would follow. Wyeth was advancing in discussions with Pfizer regarding a possible takeover of Wyeth, which would trigger massive "change of control" payments to the Individual Defendants.  And, Wyeth and Elan did not want to admit to having misled the public, including investors, about the results of the interim review that they said prompted the initiation of the Phase 3 study in the first place. However, amidst clamor for the full results of the study, Defendants scheduled a presentation for July 29, 2008 at the Alzheimer's Association's International Conference on Alzheimer's Disease 2008 ("ICAD") in Chicago, Illinois.

53.  Defendants elected, however, to make a pre-announcement of the Phase 2 results on June 17, 2008, several weeks before the full study results were disclosed at ICAD.  In that

pre-announcement, Wyeth and Elan touted the supposedly positive results of the Phase 2 trial, while continuing to conceal the negative results from the public for more than a month. The June 17, 2008, release stated that Phase 2 results were "encouraging" and provided "continued validation" of the beta amyloid hypothesis. While the June 17, 2008, release stated that no statistical significance was found on the primary endpoints, the companies spun the results, stating that *post-hoc* analysis showed "statistically significant" and "clinically meaningful" activity on Alzheimer's patients with a specific genetic mutation (ApoE4 non-carrier). This pre-announcement gave investors and the public several weeks to consider the value of a potentially effective Alzheimer's drug for ApoE4 non-carriers, and would, Wyeth no doubt hoped, blunt the effect of the negative Phase 2 results when they were finally released. Wyeth's shares, in fact, rose 4.83% on upbeat message contained in the June 17, 2008 announcement.

54. Upon the disclosure of the full Phase 2 results at ICAD on July 29, 2008, including numerous other shortcomings and limitations of B-Mab previously withheld which were dramatically at odds with the companies public statements touting "spectacular" results, the price of Wyeth's stock fell dramatically. Based on the July 29, 2009 full release of the Phase 2 results, numerous, once-hopeful researchers and scientists immediately began to question the underpinning of the beta amyloid hypothesis, including one who was quoted in *Forbes* as stating that AIP's Phase 2 results put the hypothesis "in a meltdown." Thus, the investing public was deceived into believing, throughout the Class Period, that the data from the companies' Phase 2 testing was materially different than it actually was, both in terms of undisclosed safety risks and the drug's efficacy profile.

55. Not surprisingly, Wyeth's stock price fell dramatically once investors learned for the first time about true limits of B-Mab's efficacy, its many troublesome side effects, and the

complete lack of dose response.  As one analyst stated, "[E]nough information was revealed to suggest that the Phase [2] results could be completely invalid."  Wyeth's stock price declined 11.9% in a single day (from $45.11 to $39.74, or $5.37) -- the largest single day drop in six years of trading -- on extremely heavy volume of over 55 million shares.  In this one trading day, Wyeth's market cap declined by over $7 billion.



**Wyeth Historical Chart**

56.     During the same period of time at the end of July 2008, the Large Cap Pharma Index, which is the most relevant stock market indices to Wyeth's performance, was generally on the rise, as illustrate in the following chart.



57.     Wyeth's stock price was "rescued" from its lows in or about January 2009, when the *Wall Street Journal* reported that Pfizer was advancing with talks to takeover Wyeth, sending Wyeth's shares up almost $5 dollars per share to $43.74.  The *WSJ* report, citing people familiar with the matter, said on its website that the two sides had been in discussions for months although a deal was not imminent.

58.     On September 24, 2009, the SEC's New York Regional Office initiated an informal inquiry of Wyeth and Elan and has subpoenaed records about the "disclosure on July 29, 2008, of clinical trial data for B-Mabneuzumab."  This disclosure had little to no impact on Wyeth's stock price because by that time Wyeth was already set to be acquired by Pfizer at a fixed price.

59.     Ultimately, on October 15, 2009, Pfizer acquired Wyeth in a cash and stock merger with an implied value of $50.19 per share (or an aggregate deal worth about $68 billion). Wyeth's stock ceased trading at that time.  By the terms of the merger, Wyeth merged with a specially created merger subsidiary of Pfizer, with Wyeth surviving the merger and becoming a wholly-owned subsidiary of Pfizer.

## V.     DEFENDANTS ACTED WITH SCIENTER

60.     The following facts demonstrated that Defendants acted with scienter, had a motive, and intended to deceive Plaintiff and other investors about B-Mab's commercial potential, including B-Mab's performance in Phase 2 clinical testing.

61.     Defendants knew the results of the Phase 2 study because they conducted the study and admittedly took a "sneak peek" at the interim data by at least May 2007, prior to disclosing that it would move forward with Phase 3 testing.  Defendants stated that they would conduct, and did conduct, an interim review of Phase 2 data in the Spring 2007, and after they did so they assured analysts and investors that had reviewed and were familiar with the Phase 2 study results.

62.     The Individual Defendants were all aware of the Phase 2 preliminary data because the Phase 3 test was massive, requiring hundreds of millions of dollars to be committed, and because B-Mab was one of the Wyeth's most important and promising pipeline drugs.  Any rationale, prudent executive would keep a close eye on any developments with B-Mab, the

Company's most important pipeline drug by far, particularly a development which required the initiation of a Phase 3 study requiring the expenditure of hundreds of millions of dollars in corporate funds.

63.     A positive market perception of B-Mab was critically important to Wyeth. Wyeth's stock price had languished for years in the wake diet drug litigation, patent threats and pressures on Effexor and Protonix, failed New Drug Applications with its osteoporosis drug, bazedoxifene, because of stroke and blood clot problems, its schizophrenia drug, bifeprunox, because it was not as effective as other drugs on the market, and its menopause drug, Pristiq, because of serious heart or liver complications experienced by clinical trial participants.

64.     As reported by *Barron's* in April 2008, Wyeth stock price had declined sharply from a yearly high of $62 per share to trade at a lackluster $42, despite the considerable attributes of the Company, including specifically the potential blockbuster Alzheimer's drug in its pipeline, B-Mab.  Wyeth, therefore, needed some good news during the Class Period, or at least was strongly motivated to avoid more bad news, and so it touted B-Mab as its primary success story, falsely portraying B-Mab as its most important pipeline drug with far more promise and potential than it knew B-Mab had.

65.     Certain Individual Defendants, including Essner, Poussot, Norden, and Ruffolo, also possessed a strong "motive" for fraud in this case because a perception of B-Mab's strong future potential was thought to be preserving or facilitating a Pfizer merger, which would include massive "change of control" payouts to these Wyeth executives, including immediate vesting of their stock options or restricted stock units ("RSUs").  These Individual Defendants were motivated by the potential personal financial windfall to conceal negative information about

Phase 2 testing because they knew Wyeth was a potential Pfizer takeover target and/or knew Wyeth was already in talks with Pfizer about the potential acquisition.

66.     According to the proxy statement soliciting Wyeth and Pfizer shareholder votes, for example, Wyeth and Pfizer executives first began discussions about a strategic merger on June 6, 2008, just prior to the highly-spun June 18, 2008 pre-announcement of the Phase 2 results.  But market rumors had persisted since 2007 that Pfizer and Wyeth were a match made in heaven.  Credit Suisse analyst Catherine Arnold, for example, in an August 2007 investor note, argued that Wyeth "could be the top major pharma takeout candidate" and that "Pfizer, in particular, would be a fitting takeover partner."

67.     The 2007 and 2008 time period were ripe for big pharma transactional activity, and many analysts and investors believed that a Pfizer/Wyeth deal would get done.  So Wyeth executives had a motive to preserve and/or facilitate such a transaction to receive a large financial windfall.  And they did.  In sum, according to an analysis by Equilar, a corporate compensation consultancy, certain Individual Defendants reaped substantial personal benefits from the takeover, as follows:

- CEO Bernard Poussot ($18 million)

- Former Chairman Robert Essner ($24 million)

- CFO Gregory Norden ($9 million)

- Former president Robert Ruffalo ($9 million)

68.     Certain Individual Defendants – namely Ruffolo and Martin – also engaged in highly suspicious insider trading on the release of false and misleading B-Mab news.  On May 21, 2007, the Company announced the move to Phase 3 testing, signaling to the market that the Phase 2 interim peek at the data was strong and spectacular.  *The very next day*, when the price of Wyeth stock jumped 4% on the bullish B-Mab news to trade at a Class Period high of over

$58 per share, both Ruffolo and Martin exercised options and in same day sales realized significant personal gains.  Ruffolo, for example, sold 130,436 shares on May 22, 2007, at $58.33 per share, for net gain of $2.36 million.  Martin, for his part, sold 315,036 shares between April 25-27, 2007, presumably after the interim peek at the B-Mab, at over $55 per share, realizing a net gain of $3.5 million; sold another 200,500 shares on May 22, 2007, at $57.97 per share, realizing a net gain of $283,347; and sold 12,541 shares on June 13, 2007, just two trading days prior to the Company's June 17, 2007 preliminary release of Phase 2 data, at $57.15 per share, realizing a net gain of $716,758 (for an aggregate personal financial windfall of $4,496,876).

69.    These insider trades by both Ruffolo and Martin were suspicious in both timing and amount relative to their other holdings and transactions in Wyeth stock.

## VI.    LOSS CAUSATION

70.    As a direct and proximate result of Defendants' wrongful conduct, as alleged herein, Plaintiff and the putative Class suffered substantial damages.

71.    During the Class Period, Plaintiff and the putative Class purchased Wyeth securities at artificially inflated prices and were damaged when the price of Wyeth securities declined when the truth was revealed, and/or the information alleged herein to have been concealed from the market was revealed, causing investors' losses.

72.    Specifically, Wyeth's stock declined sharply on July 29, 2008,  with the release of the Phase 2 study results at a widely attended medical conference.  Thereafter, as the market analyzed and digested the news, the stock declined further, until it was revealed that Pfizer was in advanced talks to acquire Wyeth, thereby saving Wyeth's stock price from its steady descent.

73.    Throughout the Class Period, the Defendants' false and misleading statements and omissions concerning the success of B-Mab inflated Wyeth's stock price.  Had the Defendants

revealed the Phase 2 study results and been truthful about the serious safety and efficacy concerns seen the interim peek at that trial data instead of concealing this material, negative information, Plaintiff and the putative Class would not have purchased Wyeth securities, or would not have purchased them at the artificially inflated prices at which they were offered.

74.    As a direct results of the Defendants' misrepresentations and concealment of material facts, the price of Wyeth common stock was artificially inflated throughout the Class Period.  Because of Defendants' misstatements and omissions, Wyeth common stock reached a Class Period high of $58.42 on May 22, 2007 (a day on which certain of the Wyeth Individual Defendants sold substantial portions of their personal Wyeth stockholdings).

75.    Wyeth attempted (albeit unsuccessfully) to "walk the market down" by issuing a press release on June 17, 2008, revealing for the first time an abridged and highly spun version of the Phase 2 results which were set to be released about a month later.  In the release, Wyeth portrayed the Phase 2 results as being positive in a number of significant ways, and it downplayed any perceived problems with Phase 2 testing of B-Mab.  Wyeth's attempt to blunt the effect of the release of the Phase 2 results was so effective because it was misleading and caused Wyeth stock price to actually increase about 4%.

76.    The full Phase 2 study results for B-Mab were finally disclosed on July 29, 2008, at a widely attended medical conference.  Investors then learned for the first time about true limits of B-Mab's efficacy, its many troublesome side effects, and the complete lack of dose response.  As one analyst stated, "[E]nough information was revealed to suggest that the Phase II results could be completely invalid."  On this news, Wyeth's stock price declined 11.9% in a single day (from $45.11 to $39.74, or $5.37) -- the largest single day drop in six years of trading -- on extremely heavy volume of over 55 million shares.  In this one trading day, Wyeth's market

cap declined by over $7 billion.  In total, from its Class Period of $58.42 per share on May 22, 2008, Wyeth's share price declined $18.68 per share, or 32%.

## VII.   CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wyeth publicly traded securities during the Class Period May 21, 2007 through and including July 28, 2008 (the "Class").  Excluded from the Class are (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director or controlling person of Wyeth (including any of their subsidiaries or affiliates) or any other Defendant; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representative, heirs, successors and assigns of any such excluded party.

78.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Wyeth had approximately 1.35 billion shares of common stock outstanding, owned by thousands of persons, with on average daily trading volume in excess of 1 million shares during the Class Period.

79.    There is a well-defined commonality in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (i)       whether the 1934 Act was violated by Defendants;

       (ii)      whether Defendants omitted and/or misrepresented material facts;

(iii)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv)    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(v)    whether the prices of Wyeth's publicly traded securities were artificially inflated; and

(vi)    the extent of damage sustained by Class members and the appropriate measure of damages.

80.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

81.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

83.    At all relevant times, the market for Wyeth common stock was an efficient market that promptly digested current information with respect to Wyeth from publicly available sources and reflected such information in the prices of Wyeth's shares, for the following reasons, among others:

(i)    Wyeth common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

26

(ii)     As a regulated issuer, Wyeth filed periodic public reports with the SEC and the NYSE relating to its common stock;

(iii)    Wyeth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    Wyeth was followed by dozens of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

84.    As a result of the foregoing, the market for Wyeth common stock promptly digested current information regarding Wyeth from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers Wyeth common stock suffered similar injury by trading in Wyeth common stock at artificially inflated prices and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wyeth who knew that those statements were false when made.

## X.   CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(B) of the Exchange Act and
### Rule 10(B)-5 Promulgated Thereunder
### (Against All Defendants)

86.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.  Defendants herein are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

28

89.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Wyeth, as specified herein.  In particular, Defendants engaged and participated in a continuous course of conduct to conceal adverse material information regarding the ineffectiveness of, and safety concerns relating to,  B-Mab in Phase 2 testing. Defendants concealed the negative Phase 2 results, thereby concealing the fact that B-Mab missed all clinical endpoints, and thus completely failed the Phase 2 testing.  In addition, Defendants concealed and further failed to disclose that B-Mab, as a result of Phase 2 testing, actually had demonstrated a negative impact on health due to serious safety issues encountered during the clinical study.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct involving false and misleading statements, as specified herein, to mislead and defraud analysts, investors, and the public.   In particular, Defendants made numerous affirmative misrepresentations during the Class Period, as specified above.

91.     The allegations set forth above establish a strong inference that the Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness for the purpose and effect of concealing Wyeth's present and future business prospects from the investing public and supporting the artificially inflated price of Wyeth's securities.

92.     As a result of the Defendants' dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wyeth common stock.  Plaintiffs and the Class would not have purchased Wyeth common stock at the prices they paid, would have paid less, or would not have purchased Wyeth common stock at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' fraudulent scheme,  misleading statements and material omissions.

93.     At the time of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the Plaintiffs and the Class were ignorant of the falsity of the statements and were ignorant of the omissions.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered economic damages in connection with their purchases of Wyeth common stock during the Class Period when the truth was disclosed, causing the value of Wyeth's stock to decline dramatically.

### COUNT II
### Violation Of Section 20(A) Of The Exchange Act
### (Against The Individual Defendants )

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     During the Class Period, the Individual Defendants, by virtue of their senior executive positions in Wyeth, were privy to confidential and proprietary information concerning Wyeth, its operations, finances, financial condition and present and future business prospects relating to B-Mab.  The Individual Defendants also had access to materially adverse non-public information concerning B-Mab.  Because of their positions within Wyeth, the Individual

Defendants had access to non-public information about its business, finances, products (including B-Mab), markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

97.     The Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Wyeth's business and its market disclosures.

98.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports, press releases, advertisements and marketing materials alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

99.     As senior executives and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the

NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Wyeth's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Wyeth's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

100.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Wyeth's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts concerning B-Mab. The scheme: (i) deceived the investing public regarding the results of Phase 2 clinical testing of B-Mab, its failure to show a medically advantageous effect, and the business, operations and management and intrinsic value of Wyeth's securities; and (ii) caused Plaintiff and members of the Class to purchase Wyeth's common stock at artificially inflated prices, which declined dramatically when the truth was disclosed.

101.    As set forth above, the Individual Defendants and Wyeth each violated Section 10(b) and Rule 10b-5 by their acts and omissions. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

102.    As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

**COUNT III**
**Violations Of Section 20A Of The Exchange Act**
**(Against Ruffolo and Martin)**

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    This Claim is asserted against Defendants Ruffolo and Martin (the "Section 20A Defendants"), and is based upon Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 in connection with their insider trading in Wyeth common stock.

105.    The Section 20A Defendants collectively sold more than 658,500 shares of Wyeth common stock, reaping total net proceeds in excess of $ 6.85 million.

106.    The Section 20A Defendants knowingly or with deliberate recklessness sold their Wyeth common stock during the Class Period while in possession of material, adverse, non-public information.

107.    The Section 20A Defendants made such insider Wyeth stock sales contemporaneously with purchases of Wyeth common stock by Plaintiff.

108.    By reason of Plaintiff's purchases of Wyeth stock contemporaneously with certain of the 20A Defendants' sales of Wyeth stock, Plaintiff suffered recoverable damages.  Under Section 20A of the Exchange Act, the Section 20A Defendants are liable to Plaintiff for all profits gained and losses avoided by them as a result of these contemporaneous transactions.

WHEREFORE, Plaintiff pray for relief and judgment in their favor, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel.

B.      Awarding damages to Plaintiff and the Class pursuant to Section 10(b) of the Securities Exchange Act against all Defendants, jointly and severally, in an amount to be proven at trial;

C.      Awarding damages to Plaintiff and the Class pursuant to Section 20(a) of the Securities Exchange Act against Defendants Essner, Poussot, Martin, Ruffolo and Norden;

D.      Awarding damages to Plaintiff and the Class pursuant to Section 20A of the Securities Exchange Act against Defendants Ruffolo and Martin;

E.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts;

F.      Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiff and the Class; and

G.      Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

> CARELLA, BYRNE, CECCHI,
> OLSTEIN, BRODY & AGNELLO
> Attorneys for Plaintiff
>
>
> By:     /s/ James E. Cecchi
>         JAMES E. CECCHI

Dated: June 18, 2010

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury in this action.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated: June 18, 2010

35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SECURITY POLICE AND FIRE<br>PROFESSIONALS OF AMERICA<br>RETIREMENT FUND, individually and on<br>behalf of all other similarly situated<br>stockholders,<br><br>Plaintiff,<br><br>-v.-<br><br>PFIZER, INC., as successor-in-interest to<br>WYETH, a Delaware Corporation, ROBERT<br>ESSNER, BERNARD POUSSOT,<br>KENNETH J. MARTIN, GREG NORDEN,<br>and ROBERT R. RUFFOLO, JR.,<br><br>Defendants. | *Case No.* _____ |

## CERTIFICATION OF DENNIS ECK ON
## BEHALF OF THE SECURITY POLICE AND FIRE
## PROFESSIONALS OF AMERICA RETIREMENT FUND

DENNIS ECK, for his Certification on behalf of the Security Police and Fire

Professionals of America Retirement Fund ("SPFPARF"), pursuant to 15 U.S.C. § 78u-4, states

as follows:

1.     I am Secretary and Treasurer to SPFPARF and am authorized to make this

Certification on its behalf.

2.     I have reviewed the records of the SPFPARF transactions in the stock of Wyeth

Corp. ("Wyeth") for the time period May 21, 2007 through July 29, 2008 (the "Class Period").

SPFPARF purchased 75 shares of Wyeth on June 26, 2008 at $45.57 per share, and purchased an

additional 75 shares of Wyeth on July 3, 2008 at $46.75 per share.

3.    SPFPARF and its legal counsel have fully reviewed the facts and allegations of the Complaint and have authorized its filing. SPFPARF intends to actively monitor the conduct of this action for the benefit of the class, rather than simply relying on its attorneys. SPFPARF has retained James E. Cecchi, Esq., and the law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, P.C. ("Carella Byrne") to represent it. Carella Byrne is knowledgeable and experienced in securities law and litigation, particularly with regard to the role and responsibilities of institutional investors in class actions.

4.    Like other investors who purchased Wyeth stock during the Class Period, SPFPARF believes it has suffered losses as a result of defendants' fraudulent conduct and violations of the federal securities laws. SPFPARF believes its claims against the defendants are typical of those of other members of the class.

5.    SPFPARF did not purchase the securities that are the subject of the Complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws. SPFPARF invested in Wyeth solely for its own business purposes.

6.    SPFPARF is willing to serve as a representative party on behalf of the class of former Wyeth shareholders, including providing testimony at depositions and trial. SPFPARF intends to pursue this litigation for the best interests of all class members.

7.    During the three-year period preceding the date of this Certification, SPFPARF has not served as lead plaintiff in any securities fraud class actions.

8.    During the three-year period preceding the date of this Certification, SPFPARF has not sought to serve as a representative party on behalf of a class in any securities fraud class actions

9.    SPFPARF will not accept any payment for serving as representative party on

behalf of the class beyond the plaintiffs' pro rata share of any recovery, except as ordered and

approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated: June 16, 2010

Mr. Dennis Eck
Secretary and Treasurer