NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA RETIREMENT FUND, individually and on behalf of all other similarly situated stockholders,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>PFIZER, INC., as successor-in-interest to WYETH, a Delaware corporation, ROBERT ESSNER, BERNARD POUSSOT, KENNETH J. MARTIN, GREG NORDEN, and ROBERT R. RUFFOLO, JR.,<br><br>　　　　　　　　　　Defendants. | Civil Action No. 10-cv-3105 (SDW)(MCA)<br><br>OPINION<br><br>February 10, 2012 |

**WIGENTON**, District Judge.

　　Before the Court is Defendants Pfizer, Inc., as successor-in-interest to Wyeth, a Delaware Corporation, Robert Essner, Bernard Poussot, Kenneth J. Martin, Greg Norden, and Robert R. Ruffolo, Jr.'s (collectively "Defendants") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court has jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Venue is proper pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391. This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **GRANTS** Defendants' Motion.

**I.　BACKGROUND**

　　This matter involves Plaintiff Security Police and Fire Professionals of America Retirement Fund ("Plaintiff") and Defendants. Lead Plaintiffs bring this action as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Wyeth publicly traded common stock during the class period of May 21, 2007 through July 29, 2008.  In this securities fraud class action, Lead Plaintiffs allege all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10(b)-5 promulgated thereunder.  In addition, Lead Plaintiffs allege Defendants Essner, Poussot, Martin, Norden, and Ruffolo violated Section 20(a) of the Exchange Act.  Finally, Lead Plaintiffs also allege Defendants Ruffolo and Martin violated Section 20A of the Exchange Act.  The issue before this Court is whether Defendants' actions violated Sections 10(b), 20(a) and 20A of the Exchange Act.

II.   **FACTS**

Plaintiffs have brought this securities class action on behalf of a class of investors who purchased Wyeth common stock during the period of May 21, 2007 to July 29, 2008 ("Class Period").  (Compl. ¶¶ 1-2.)  During the Class Period, Wyeth, now a wholly owned subsidiary of Pfizer, Inc., was engaged in the discovery, development, manufacture and distribution of pharmaceutical and healthcare products.  (*See Id.* ¶¶ 11-12.)  Defendants Robert Essner, Bernard J. Poussot, Jr., Kenneth J. Martin, and Robert R. Ruffolo, Jr., Ph.D. all served as senior executives at Wyeth during the class period.  (*Id.* ¶¶ 13-21.)

   A. Development and Testing of Bapineuzumab

Beginning in April 2000, Wyeth collaborated with Elan, a biotechnology company based in Ireland, on the Alzheimer's Immunotherapy Program ("AIP"), a project aimed at developing treatments for a number of neurodegenerative conditions, including Alzheimer's disease.  (*Id.* ¶¶ 4, 37.)  As part of the AIP, Wyeth and Elan jointly developed bapineuzumab ("AAB-001"), an experimental humanized monoclonal antibody for the treatment of mild to moderate Alzheimer's

disease. (*Id.* ¶ 4.) AAB-001 is designed to clear toxic beta amyloid plaque from the brain in order to slow or prevent mental degradation. *Id.* The profit potential for the first Food and Drug Administration ("FDA") approved Alzheimer's drug is enormous. (*Id.* ¶¶ 35-36, 47, 72.) In 2007, securities analysts noted that if AAB-001 were approved, it would be an $8.8 billion drug by 2016, generating $5 billion a year in revenues. (*Id.* ¶ 47.)

As part of the drug approval process, the FDA and an outside independent review board approve company-designed clinical trial protocols regarding participants and procedures, as well as the underlying clinical study's objectives which are referred to as endpoints. (Defs.' Br. at 5.) The clinical trial program for AAB-001, like that of many other pharmaceutical products, followed a three sequential phases. (Compl. ¶ 42-46.) Phase I of the trial tested the drug on a small number of patients to ascertain its safety. (*Id.* ¶ 42.) During Phase II of the trial, various doses of AAB-001 were tested on patients to evaluate the preliminary indicia of the drug's efficacy on the target patient population. (*Id.* ¶ 44.) Phase III studied the effectiveness and safety of the drug at various doses in different and larger patient populations over an extended period of time. (*Id.* ¶ 46.)

Based on data from Phase I of the clinical study of AAB-001 and the unmet needs of medical patients suffering from Alzheimer's, Wyeth sought and received "Fast Track" designation for AAB-001. (*Id.* ¶ 42.) "Fast track" status signified that Wyeth was "eligible for more frequent interaction and responsiveness from the FDA." (*Id.* ¶ 42.) This included "priority review from the FDA and accelerated approval if further clinical testing [proved] to be promising. (*Id.* ¶ 42.) Wyeth began Phase II testing in April 2005, even before Phase I testing was complete. (*Id.* ¶¶ 43-44.) Wyeth and Elan completed Phase I and disclosed the results at a scientific conference on April 20, 2006. (Defs.' Br. 5.)

3

### B. Defendant's Statements Regarding Accelerated Move to Phase III Clinical Trials of AAB-001

Before the conclusion of the Phase II trials, Wyeth planned to analyze Phase II data for drug efficacy using the Alzheimer's Disease Assessment Scale – Cognitive ("ADAS-cog") and Disability Assessment for Dementia ("DAD") tests. (*Id.* ¶ 44.) Wyeth also planned to conduct an interim review of preliminary Phase II results ("Phase II Interim Results") to determine whether to proceed to Phase III and when. (*Id.* ¶ 48.) In October 2006, at its annual meeting for securities analysts, Robert Ruffolo ("Ruffolo"), the President of Wyeth Research, discussed the potential for an accelerated move to Phase III where he said:

> Now, again we don't have any results from this [Phase II] study at all, but we have a planned interim look at the data at the end of this year. And, based on this interim look, we could do two things. One, depending on the data, we could advance directly into Phase III in the first half of 2007, but the results would have to be spectacular. We don't know what results we're going to get. Alternatively, we could complete the study and then move to the next interim look, which would be in the first half of 2007.

(*Id.* ¶ 50.)

Subsequently, during a healthcare conference on January 9, 2007, Elan executives stated that:

> The important thing to emphasize is that Wyeth and ourselves have agreed to certain very specific criteria that need to be met in this Phase II trial in order to propel us into Phase III. We have also jointly with Wyeth decided that we will not comment on when and how we're going to do the interim looks. We will inform the market when we have met the hurdles that we jointly set. And to paraphrase Bob Ruffolo, he said the data has to be – he used the word spectacular. I use the word it has to be strong, it has to be very meaningful. There are companies that decide to move into Phase III based on circumstantial evidence of efficacy, et cetera, but that's not the way we're going to operate.

(*Id.* ¶ 52.)

### C. Defendant's May 21, 2007 Press Release Announcing Decision to Advance to Phase III Clinical Trials of AAB-001

On May 21, 2007, Wyeth and Elan issued a joint press release ("May 21 Press Release") announcing their decision to initiate Phase III clinical trials of AAB-001. (*Id.* ¶¶ 61,75.) The May 21 Press Release cited the Phase II Interim Results as among one of the considerations justifying the accelerated move to Phase III testing. (*Id.* ¶ 75.) Specifically, the May 21 Press Release stated:

> [Elan Corporation] and[ Wyeth Pharmaceuticals], a division of Wyeth, today announced the decision to initiate a Phase III clinical program of their lead immunotherapeutic candidate, Bapineuzumab (AAB-001), for the treatment of patients with mild to moderate Alzheimer's Disease. This decision was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase II study, which remains blinded. No conclusion about the Phase II study can be drawn until the study is completed and the final data are analyzed and released in 2008. Phase III clinical trial design will be finalized with regulatory agencies, and subject to regulatory approval, it is intended for the trial to begin in the second half of 2007.

(*Id.* ¶ 75.)

Wyeth's stock price increased 3.6% from $56.38 at close on Friday, May 18, 2007 to $58.41 at close on Monday, May 21, 2007 and $58.42 at close on Tuesday, May 22, 2007. (*Id.* ¶¶ 70, 80.) On May 22, 2007, Ruffolo sold a large block of his personal Wyeth shares to realize a net gain of over $2.3 million. (*Id.* ¶ 80.) On the same day, Ruffolo attended the Citigroup Healthcare Conference and refused to discuss the Phase II Interim Results when specifically asked about the matter, instead referring to the May 21 Press Release. (*Id.* ¶¶ 78-79.) Wyeth and Elan eventually initiated Phase III trials of AAB-001 in December 2007. (*See* Wyeth 2007 Form 10-K).

### D. Defendant's Subsequent Statements about AAB-001

Plaintiffs allege that Wyeth personnel continued to mislead investors about the Phase II Interim Results through statements about AAB-001 at healthcare conferences and earnings conference calls after the May 21 Press Release. (*Id.* ¶¶ 81-94.) Specifically, Plaintiffs allege that misleading statements regarding the importance of the Phase II Interim Results were made during earnings conference calls on July 19, 2007 and April 22, 2008. (*Id.* ¶¶ 81, 87.) In addition, Plaintiffs allege that statements made at the JP Morgan Chase Healthcare Conference on January 8, 2008 and the Lehman Brothers Global Healthcare Conference on March 19, 2008 were misleading to investors. (*Id.* ¶¶ 83, 85.)

### E. June 17, 2008 Press Release

On June 17, 2008 Wyeth and Elan issued a joint press release ("June 17 Press Release") announcing the preliminary results of the Phase II trial of AAB-001. (*Id.* ¶¶ 90-91.) The June 17 Press Release discussed both positive aspects and negative aspects of the Phase II clinical trial. The June 17 Press Release referred to the results as "encouraging", specifically stating that Phase II testing results had demonstrated encouraging signs of efficacy in an important sub-group of Alzheimer's patients. (*Id.*) The June 17 Press Release did not, however, discuss the means by which Wyeth was able to demonstrate signs of efficacy in this sub-group of Alzheimer's patients. (*Id.*) Despite the positive tone, the press release cautioned that "[t]here can be no assurance that the clinical program for bapineuzumab will be successful in demonstrating safety and/or efficacy" and that the statements in the press release were made "subject to the risk that further analyses of the Phase II data may lead to different (including less favorable) interpretations of the data." (*Id.*)

Also, the June 17 Press Release disclosed that Phase II results had demonstrated efficacy problems, stating that AAB-001 "did not attain statistical significance on the primary efficacy

6

endpoints in the overall study population." (*Id.* ¶ 90.) Further, the June 17 Press Release disclosed safety concerns, noting that "serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients." (*Id.*) The June 17 Press Release stated that the complete Phase II results would be disclosed on July 29, 2008 at the International Conference on Alzheimer's Disease ("ICAD"). (*Id.*)

    **F.   Release of Complete Phase II Results at July 29, 2008 ICAD**

Wyeth held an investor call on July 23, 2008 to discuss its second quarter earnings report. (*Id.* ¶ 92.) During the call, Pousott discussed the Phase II results, stating that the results were encouraging and supported Wyeth's decision to initiate Phase III Clinical Trials. (*Id.*) The Phase II results were finally released in a joint press release on July 29, 2008 and presented at the ICAD on the same day. (*Id.* ¶¶ 94-96.) Upon release of the complete testing results, investors discovered that the Phase II trial did not contain the promising results for which the investors had hoped. (*Id.* ¶¶ 94-101.) In response to the July 29, 2008 disclosure, Wyeth's stock price declined 11.9% from $45.11 to $39.74. (*Id.* ¶ 102.) Wyeth and Elan have continued with the AIP as Phase III clinical testing is currently underway. (*See* Pfizer Inc. 2010 Form 10-K.)

**III.   LEGAL STANDARD**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  As the Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556–57, 570) (internal citations omitted).

Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to demonstrate "that the pleader is entitled to relief" as required by Federal Rule of Civil Procedure 8(a)(2).  Id. Further, "[a] court may dismiss a complaint for failure to state a claim, based on a time-bar, where 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 355 n.11 (D.N.J. 2003) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

## IV.    DISCUSSION

To state a claim under Section 10b-5 of the Exchange Act Plaintiffs must allege that a defendant "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which [Plaintiffs] reasonably

8

relied and (5) that [Plaintiffs'] reliance was the proximate cause of [their] injury." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004). In establishing this claim, the Private Securities Litigation Reform Act ("PSLRA") heightens Plaintiffs' burden by providing Plaintiffs with two distinct pleading requirements. First, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B)(2012). Second, the PSLRA also requires that the applicable mental state, in this case scienter, be pled with particularity. *Id.* at § 21D(b)(2). Significantly, both supplemental PSLRA pleading requirements call for facts to be pled **with particularity**.[1]

### A. May 21, 2007 Press Release

Plaintiffs' allegations about Bapineuzumab concern (1) the alleged impression that Defendants created by stating that Defendants would only proceed to Phase III of testing if phase II testing was "spectacular", and (2) the incomplete information that Defendants provided about the results of Phase II. Specifically, Plaintiffs allege that in the May 21st Press Release, Defendants, by announcing the planned commencement of Phase III testing, misled investors to believe that the results of the Phase II Alzheimer study were "spectacular" enough to warrant moving on to Phase III. (Compl. ¶ 61, 75.) Plaintiffs also allege that Defendants, in the May 21 Press Release, failed to disclose that: (1) "the Companies had engaged in post-hoc analyses of patient subgroups" and had "changed the statistical mode post-hoc from linear to curvilinear",

---

[1] The PSLRA replaced Federal Rule of Civil Procedure 9(b) as the pleading standard governing private securities class actions, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-320 (2007), effectively adopting Rule 9(b) standard and intensifying it.

and (2) Defendants should have disclosed various efficacy and safety concerns. (*Id*. ¶¶ 76(c)-(f).)

Regarding Plaintiffs' first contention, Plaintiffs' argument essentially follows the logic that because Defendants' October 2006 statement regarding Phase III set forth a condition precedent to the commencement of Phase III testing and since Phase III testing was launched, the presumption should be that the condition precedent was met. While Plaintiffs' logic is appreciated, it cannot hold true here because of the cautionary language in the May 21 Press Release. The press release explicitly stated that the Defendants' decision "was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled interim look at data from an ongoing Phase II study, which remains blinded." (Certification of Stephen C. Matthews ("Matthews Cert.") Ex. C.) The press release also stated that "[n]o conclusion about the Phase II study can be drawn until the study is completed and the final data are analyzed and released in 2008." (*Id.*) Plaintiffs do not allege that there are any **specific** statements in the May 21 Press Release that are false and misleading, but rather allege that the announcement in the press release is misleading given Defendants' October 2006 statement. Accordingly, Plaintiffs allegations regarding Defendants' announcement to begin Phase III trials do not adequately allege a misstatement.

Regarding Plaintiffs' second argument concerning omissions, rule 10b-5 requires an omission to be of a material fact. *See* 15 U.S.C. § 78u-4(b) (2012). Material information is 'information that would be important to a reasonable investor in making his or her investment decision.'" *Oran v.* Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (quoting *Burlington*, 114 F.3d at 1425)). "Generally, undisclosed information is considered material if 'there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having

10

"significantly altered the 'total mix' of information" available to that investor.'" *Id.* (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir.1996) (quotations omitted)). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, (1988); see also *Burlington*, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information."). "Such a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285-86. None of these circumstances are present here.[2] Therefore, Plaintiffs' argument regarding Defendants' alleged omissions in the May 21 Press Release are ineffective.

### B. Other Post May 21, 2007 Statements

Plaintiffs have alleged that there are six additional public statements made by Wyeth personnel either at healthcare conferences or during earnings conference calls that were false or misleading because of omissions. Plaintiffs allege that the statements made at industry conferences or conference calls: (1) failed to disclose the safety and efficacy problems in the Phase II study, (2) failed to disclose that the interim look at Phase II data did not meet pre-established criteria for efficacy and safety, and (3) concealed that Phase 2 testing was a near failure. (*See* Compl. ¶¶ 79, 81-87, 89, 92-93.)

Again Plaintiffs fail to argue the materiality of the information that was not disclosed. Furthermore, even assuming that the information was material, Plaintiffs have also failed to establish that Defendants had a duty to disclose the information at issue. *See Levinson*, 485 U.S. at 239 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also*

---

[2] Plaintiffs do claim insider trading; however, that cause of action fails as it cannot stand without a predicate violation of section rule 10b-5. *See In re Milestone Sci. Sec. Litig.*, 103 F. Supp.2d 425, 474 (D.N.J. 2000).

*Burlington*, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information."). Therefore, Plaintiff's argument fails.[3]

### C. June 17, 2008 Press Release

Plaintiffs also argue that Defendants committed securities fraud through Defendants' factual omissions in the June 17 Press Release. Plaintiffs specifically argue that Defendants represented the Phase II results as being encouraging when in actuality the results were not promising. (Pls.' Br. 19.) Plaintiffs argue that since Defendants had the Phase II results in April 2008, Defendants incomplete disclosure of Phase II results in the June 17 Press Release was misleading. (Pls.' Br. 19.) Regarding the incomplete disclosures, Plaintiffs specifically argue that Defendants failed to disclose: (1) the "prevalence" of "vasogenic edema "among the study population or the fact that [vasogenic edema was one of the many] serious problems experienced by AAB-001 recipients", (2) "the manipulative manner in which the slight efficacy advantage in ApoE4 non-carriers was achieved, or the fact that . . . this slight efficacy advantage might be completely invalid on account of extreme variability seen in the data", (3) "the overwhelming percentage of patients that AAB-001 did not help, the variability and randomness of the data, or the complete lack of dose response." (Compl. ¶ 91.) Plaintiffs' arguments fail because of their failure to establish that Defendants had a duty to disclose the information at issue.[4]

---

[3] Plaintiffs' argument here is also unavailing for additional reasons. First, the statements which Plaintiffs contend are misleading all contain cautionary language stating that Defendants **considered** the interim Phase II results in their decision to proceed to Phase III testing. Second, in one of the conference calls referred to by Plaintiffs in their complaint, the May 22, 2007 conference call, Robert Ruffolo, senior vice-president of Wyeth, explicitly stated in his response to a question that there was no preset criteria that required compliance in order to proceed to Phase 3 testing. (*See* Matthews Cert. Ex. E.) Third, Plaintiffs' allegation that the Phase II results were a failure fails to illustrate a misleading omission in light of the fact that Defendants explicitly stated on several occasions that the Phase II results were not the sole determinative factor in deciding to proceed to Phase III testing.

[4] Plaintiffs also argue in their brief that the market reaction to May 2st and June 17 press releases, where the stock price increased after both press releases, and the market reaction to the July 29th press release, where the stock price decreased, is evidence that Defendants' statements were misleading. Plaintiffs, however, have failed to present any

### D. Section 20a and Insider Trading

Plaintiffs also bring a claim for insider trading pursuant to Section 20a and Section 20A of the Exchange Act. To bring a viable claim under Section 20A for insider trading, a plaintiff must plead a predicate violation of the Exchange Act. *See In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 387 (D.N.J. 1999)(citations omitted). Additionally, a plaintiff must allege: "(1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act." *In re Advanta Corp. Sec. Litig.*, No. 97–CV–4343, 1998 WL 387595 at * 9 (E.D.Pa. July 9, 1998), *aff'd*, 180 F.3d 525 (3d Cir.1999) (*overruled on other grounds*).

"Section 20(a) creates liability upon anyone who 'controls a person liable under any provision of' the Securities Exchange Act of 1934." *In re Cendant Corp. Litig.*, 60 F.Supp.2d at 379. "To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were 'in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.'" *Id.* (quoting *Rochez Bros,. Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975) (quotations omitted)).

Since claims under Sections 20a and 20A require a predicate violation of the Exchange Act and Plaintiffs have failed to adequately plead a claim under section 10b, Plaintiffs' Section 20a and 20A claims are dismissed. *See In re Advanta Corp.*, No. 97-4343, 1998 WL 387595 (E.D. Pa July 09, 1998).

---

basis, case law or otherwise, for their contention that market reaction is a factor in determining the falsity of a statement in the context of securities law.

**CONCLUSION**

For the reasons stated above, this Court **GRANTS** Defendants' Motion to Dismiss.

<u>s/Susan D. Wigenton, U.S.D.J.</u>

Orig: Clerk
Cc: Madeline Cox Arleo, U.S.M.J.
    Parties