<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA RETIREMENT FUND, individually and on behalf of all other similarly situated stockholders,<br><br>Plaintiff,<br><br>v.<br><br>PFIZER, INC., as successor-in-interest to WYETH, a Delaware corporation, ROBERT ESSNER, BERNARD POUSSOT, KENNETH J. MARTIN, GREG NORDEN, and ROBERT R. RUFFOLO, JR.,<br><br>Defendants. | Civil Action No. 10-cv-3105 (SDW)(MCA)<br><br>**OPINION**<br><br>April __, 2013 |

**WIGENTON**, District Judge.

Before this Court is Defendants Pfizer, Inc., as successor-in-interest to Wyeth, a Delaware Corporation, Robert Essner, Bernard Poussot, Kenneth J. Martin, Greg Norden, and Robert R. Ruffolo, Jr.'s (collectively "Defendants") motion to dismiss Security Police and Fire Professionals of America Retirement Fund, The City of Edinburgh Council as Administering Authority of the Lothian Pension Fund, and Arca S.G.R. S.p.A. 's (collectively "Lead Plaintiffs" or "Plaintiffs") second amended consolidated complaint ("SACC") pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **GRANTS** Defendants' motion.

I.  **BACKGROUND & PROCEDURAL HISTORY**

On March 2, 2012, Plaintiffs filed a motion for leave to file an amended complaint, which Defendants contested. (*See* Dkt. Nos. 69, 77.) On December 6, 2012, Magistrate Judge Madeline Cox Arleo issued a report and recommendation suggesting that this Court grant Plaintiffs' motion for leave to file a SACC. (*See* Dkt. No. 86.) On December 21, 2012, this Court obliged. (*See* Dkt. No. 94.) On January 17, 2013, Defendants moved to dismiss Plaintiffs' SACC.

Plaintiffs pursue this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Wyeth publicly traded common stock during the class period of May 21, 2007 through July 29, 2008 ("Class Period"). In this securities fraud class action, Plaintiffs allege all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10(b)-5 promulgated thereunder. In addition, Plaintiffs allege Defendants Essner, Poussot, Martin, Norden, and Ruffolo violated Section 20(a) of the Exchange Act. Finally, Plaintiffs also allege Defendants Ruffolo and Martin violated Section 20A of the Exchange Act. The issue before this Court is whether Plaintiffs have sufficiently alleged violations of Sections 10(b), 20(a) and 20A of the Exchange Act.

II.  **FACTS**

Plaintiffs have brought this securities class action on behalf of a class of investors who purchased Wyeth common stock during the Class Period. (*See* SACC ¶¶ 1-2.) During the Class Period, Wyeth, now a wholly owned subsidiary of Pfizer, Inc., was engaged in the discovery, development, manufacture and distribution of pharmaceutical and healthcare products. (*See id.* ¶¶ 9, 22.) Defendants Robert Essner, Bernard J. Poussot, Jr., Kenneth J. Martin, and Robert R.

Ruffolo, Jr., Ph.D. all served as senior executives at Wyeth during the Class Period. (*See id.* ¶¶ 6-10.)

### A. Development and Testing of Bapineuzumab

Beginning in April 2000, Wyeth collaborated with Elan, a biotechnology company based in Ireland, on the Alzheimer's Immunotherapy Program ("AIP"), a project aimed at developing treatments for a number of neurodegenerative conditions, including Alzheimer's disease. (*See id.* ¶¶ 4, 31.) As part of the AIP, Wyeth and Elan jointly developed bapineuzumab ("AAB-001"), an experimental humanized monoclonal antibody for the treatment of mild to moderate Alzheimer's disease. (*See id.* ¶¶ 31-32.) AAB-001 is designed to clear toxic beta amyloid plaque from the brain in order to slow or prevent mental degradation. (*See* SACC ¶ 32.)

As part of the drug approval process, the Food and Drug Administration ("FDA") and an outside independent review board approve company-designed clinical trial protocols regarding participants and procedures, as well as the underlying clinical study's objectives which are referred to as endpoints. (*See* Dkt. No. 55-2 at 5.) The clinical trial program for AAB-001, like that of many other pharmaceutical products, followed three sequential phases. (*See id.* ¶ 42-46.) Phase I of the trial tested the drug on a small number of patients to ascertain its safety. (*See id.* ¶¶ 37-38.) During Phase II of the trial, various doses of AAB-001 were tested on patients to evaluate the preliminary indicia of the drug's efficacy on the target patient population. (*See id.*) Phase III studied the effectiveness and safety of the drug at various doses in different and larger patient populations over an extended period of time. (*See id.* ¶ 40.)

Based on data from Phase I of the clinical study of AAB-001 and the unmet needs of medical patients suffering from Alzheimer's, Wyeth sought and received "Fast Track" designation for AAB-001. (*See id.* ¶ 36.) "Fast track" status signified that Wyeth was "eligible

for more frequent interaction and responsiveness from the FDA." (*Id.*)  This included "priority review [from the FDA] and accelerated approval if further clinical testing [proved] to be promising." (*Id.*)  Wyeth began Phase II testing in April 2005, even before Phase I testing was complete.  (*See id.* ¶¶ 37-38.)  Wyeth and Elan completed the Phase I trial and disclosed the results at a scientific conference in April 2006.  (*See id.* ¶ 36.)

**B. Defendants' Statements Regarding Accelerated Move to Phase III Clinical Trials of AAB-001**

Before the conclusion of the Phase II trials, Wyeth planned to analyze Phase II data for drug efficacy using the "Alzheimer's Disease Assessment Scale – Cognitive ("ADAS-cog") and Disability Assessment for Dementia ("DAD") tests." (SACC ¶¶ 38, 45.)  Wyeth also planned to conduct an interim review of preliminary Phase II results ("Phase II Interim Results") to determine whether to proceed to Phase III and when.  (*See id.* ¶ 43.)  In October 2006, at its annual meeting for securities analysts, Robert Ruffolo, the President of Wyeth Research, discussed the potential for an accelerated move to Phase III where he said:

> Now, again we don't have any results from this [Phase II] study at all, but we have a planned interim look at the data at the end of this year.  And, based on this interim look, we could do two things.  One, depending on the data, we could advance directly into Phase III in the first half of 2007, but the results would have to be spectacular.  We don't know what results we're going to get.  Alternatively, we could complete the study and then move to the next interim look, which would be in the first half of 2007.

(*Id.* ¶ 44.)

Subsequently, during a healthcare conference on January 9, 2007, Elan executives stated that:

> The important thing to emphasize is that Wyeth and ourselves have agreed to certain very specific criteria that need to be met in this Phase II trial in order to propel us into Phase III.  We have also jointly with Wyeth decided that we will not comment on when and how we're going to do the interim looks.  We will inform the market when we have met the hurdles that we jointly set.  And to paraphrase Bob Ruffolo, he said the data has to be – he used the word spectacular.  I use the word it has to be strong, it has to be very meaningful.  There are

4

companies that decide to move into Phase III based on circumstantial evidence of efficacy, et cetera, but that's not the way we're going to operate.

(*Id.* ¶ 46.)

### C. Defendants' May 21, 2007 Press Release Announcing Decision to Advance to Phase III Clinical Trials of AAB-001

On May 21, 2007, Wyeth and Elan issued a joint press release ("May 21 Press Release") announcing their decision to initiate Phase III clinical trials of AAB-001. (*See id.* ¶¶ 52, 75.) The May 21 Press Release cited the Phase II Interim Results as one of the considerations justifying the accelerated move to Phase III testing. (*See id.* ¶ 52.) Specifically, the May 21 Press Release stated:

> [Elan Corporation] and [Wyeth Pharmaceuticals], a division of Wyeth, today announced the decision to initiate a Phase III clinical program of their lead immunotherapeutic candidate, Bapineuzumab (AAB-001), for the treatment of patients with mild to moderate Alzheimer's Disease. This decision was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase II study, which remains blinded. No conclusion about the Phase II study can be drawn until the study is completed and the final data are analyzed and released in 2008. Phase III clinical trial design will be finalized with regulatory agencies, and subject to regulatory approval, it is intended for the trial to begin in the second half of 2007.

(Cert. of Stephen C. Matthews ("Matthews Cert."), Ex. A.)

Wyeth's stock price increased 3.6% from $56.38 at close on Friday, May 18, 2007 to $58.41 at close on Monday, May 21, 2007 and $58.42 at close on Tuesday, May 22, 2007. (*See* SACC ¶ 80.) On May 22, 2007, Ruffolo sold a large block of his personal Wyeth shares to realize a net gain of over $2.3 million. (*See id.*) On the same day, Ruffolo attended the Citigroup Healthcare Conference and refused to discuss the Phase II Interim Results when specifically asked about the matter, instead referring to the May 21 Press Release. (*See id.* ¶¶ 78-79.) Wyeth and Elan eventually initiated Phase III trials of AAB-001 in December 2007.

5

### D. Defendants' Subsequent Statements about AAB-001

Plaintiffs allege that Wyeth personnel continued to mislead investors about the Phase II Interim Results through statements about AAB-001 at healthcare conferences and earnings conference calls after the May 21 Press Release. (*See* SACC ¶¶ 78-94.) Specifically, Plaintiffs allege that misleading statements regarding the importance of the Phase II Interim Results were made during earnings conference calls on July 19, 2007 and April 22, 2008. (*See id.* ¶¶ 81-83, 88-90.) In addition, Plaintiffs allege that statements made at the Citigroup Healthcare Conference on May 22, 2007, the JP Morgan Chase Healthcare Conference on January 8, 2008, and the Lehman Brothers Global Healthcare Conference on March 19, 2008 were misleading to investors. (*See id.* ¶¶ 78-80, 84-87.)

### E. June 17, 2008 Press Release

On June 17, 2008, Wyeth and Elan issued a joint press release ("June 17 Press Release") announcing the preliminary results of the Phase II trial of AAB-001. (*See id.* ¶¶ 91-92.) The June 17 Press Release discussed both positive aspects and negative aspects of the Phase II clinical trial. (*See id.* ¶ 91.) The June 17 Press Release referred to the results as "encouraging," specifically stating that Phase II testing results had demonstrated encouraging signs of efficacy in an important sub-group of Alzheimer's patients. (*Id.*) The June 17 Press Release did not, however, discuss the means by which Wyeth was able to demonstrate signs of efficacy in this sub-group of Alzheimer's patients. (*See* SACC ¶ 91.) Despite the positive tone, the press release cautioned that "[t]here can be no assurance that the clinical program for bapineuzumab will be successful in demonstrating safety and/or efficacy" and that the statements in the press release were made "subject to the risk that further analyses of the Phase II data may lead to different (including less favorable) interpretations of the data." (*Id.*)

Also, the June 17 Press Release disclosed that Phase II results had demonstrated efficacy problems, stating that AAB-001 "did not attain statistical significance on the primary efficacy endpoints in the overall study population." (*Id.* ¶ 91.) Further, the June 17 Press Release disclosed safety concerns, noting that "serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients." (*Id.*) The June 17 Press Release stated that the complete Phase II results would be disclosed on July 29, 2008 at the International Conference on Alzheimer's Disease ("ICAD"). (*Id.*)

### F. Release of Complete Phase II Results at July 29, 2008 ICAD

Wyeth held an investor call on July 23, 2008 to discuss its second quarter earnings report. (*See id.* ¶ 95.) During the call, Bernard Poussot discussed the Phase II results, stating that the results were encouraging and supported Wyeth's decision to initiate Phase III Clinical Trials. (*Id.*) The Phase II results were finally released in a joint press release on July 29, 2008 and presented at the ICAD on the same day. (*See id.* ¶¶ 113-14.) Upon release of the complete testing results, investors discovered that the Phase II trial did not contain the promising results investors had hoped. (*See id.* ¶¶ 114-23.) In response to the July 29, 2008 disclosure, Wyeth's stock price declined 11.9% from $45.11 to $39.74. (*See id.* ¶ 121.) Wyeth and Elan have continued with the AIP as Phase III clinical testing is currently underway.

#### i. **Defendants' Arguments**

Defendants seek to dismiss Plaintiffs' complaint on four grounds. First, Defendants argue that the SACC does not adequately allege any false statement. Second, Defendants argue that the SACC does not adequately allege any misleading omissions. Third, Defendants argue that the SACC does not adequately allege scienter. Last, Defendants argue that Plaintiffs fail to allege insider trading and control fraud. (*See generally* Defs.' Br. Supp.. Summ. J.)

7

### III. LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As the Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556–57, 570) (internal citations omitted).

Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to demonstrate "that the pleader is entitled to relief" as required by Federal Rule of Civil Procedure 8(a)(2). *Id*.

Further, "[a] court may dismiss a complaint for failure to state a claim, based on a time-bar, where 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 355 n.11 (D.N.J. 2003) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

## IV.     DISCUSSION

To state a claim under Section 10b-5 of the Exchange Act Plaintiffs must allege that Defendants: "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which [Plaintiffs] reasonably relied and (5) that [Plaintiffs'] reliance was the proximate cause of [their] injury." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004)(quoting *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 3d Cir. 2002)). In establishing this claim, the Private Securities Litigation Reform Act ("PSLRA") heightens Plaintiffs' burden by setting forth two distinct pleading requirements. First, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B) (West 2010). Second, the PSLRA also requires that the applicable mental state, in this case scienter, be pled with particularity. *See id.* at § 78u-4(b)(1)(B) (West 2010).

### i.     *February 10, 2012 Opinion*

This Court's February 10, 2012 Opinion granted Defendants' first motion to dismiss for failure to state a claim upon which relief can be granted. Regarding the May 21, 2007 Press Release, Plaintiffs specifically alleged that Defendants, by announcing that they planned to commence Phase III, misled investors to believe that the Phase II results must have been

9

spectacular enough to warrant Phase III testing. (*See* Dkt. No. 63 at 9.) Plaintiffs also alleged that Defendants failed to disclose that: (1) "the Companies had engaged in post-hoc analyses of patient subgroups" and had "changed the statistical mode post-hoc from linear to curvilinear," and (2) Defendants should have disclosed various efficacy and safety concerns. (*Id*.) This Court held that Plaintiffs' first argument was unavailing because the May 21, 2007 Press Release contained cautionary language that neutralized any potential harmful language by Defendants. (*See id.* at 10.) Regarding Plaintiffs' second argument, this Court found that Plaintiffs failed to successfully allege that Defendants had a duty to disclose the alleged omitted information. (*See id.* at 11.)

Concerning the June 17, 2008 Press Release, Plaintiffs argued that Defendants represented the Phase II results as being encouraging when in actuality they were not. (*See id.* at 12.) Plaintiffs also argued that Defendants failed to disclose the specifics of the Phase II findings. (*Id.*) This Court found that Plaintiffs argument failed due to Plaintiffs' inability to establish that Defendants had a duty to disclose the specific information that Plaintiffs referenced. (*See id.* at 12.)

Regarding Plaintiffs' Section 20a and insider trading claims, this Court found that Plaintiffs could not sustain these claims as each one must be predicated on a violation of the Exchange Act, which was not possible since Plaintiffs failed to sufficiently plead their 10b-5 claim. (*See id.* at 13.)

   *ii.* *Second Amended Consolidated Complaint*

     a. <u>10b-5 Claim</u>

      1. May 21 Press Release

  Regarding the May 21 Press Release, Plaintiffs now argue that Defendants' statement that the decision to proceed with Phase III testing was based, in part, on a scheduled look at Phase II data was affirmatively false because Defendants' decision was not based on Phase II interim data.  (*See* Pl.'s Opp'n Br. 17.)  Plaintiffs also point to new allegations from a second confidential witness ("CW2") which Plaintiffs allege corroborate their assertions concerning Defendants truthfulness.  (*See id.* (citing SACC ¶¶ 54-55).)  Plaintiffs also argue that by discussing Phase II interim results, Defendants created a duty to completely disclose the details of the results.  (*See* Pls.' Opp'n Br. 19 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).)

  Plaintiffs' new allegation that Defendants' statement was affirmatively false as opposed to misleading does little to change the fact that Defendants' statement, when taken in context was not misleading.  Defendants specifically stated that:

> [its] decision was based on the seriousness of [Alzheimer's] and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase II study, which remains blinded.  No conclusion about the Phase II study can be drawn until the study is completed and the final data are analyzed and released in 2008.

(*See* Matthews Cert., Ex. A.)  Plaintiffs' argument that Defendants' statement is affirmatively false is still based on Defendants' previous statement in its October 2006 statement that it would only proceed to Phase III if the Phase II results met a certain criteria.  Therefore, Plaintiffs argument, while characterized differently, is still based on the same facts.  Also, Plaintiffs' reliance on confidential witnesses does not change the reasonable meaning of Defendants' statement. The ability of the first confidential witness ("CW1") and CW2  to corroborate the fact

11

that the Phase II interim data did not meet the criteria necessary to proceed with a Phase III trial does not change the fact that Defendants' statements were cautious.  Last, Plaintiffs' reliance on *Shapiro* for its argument that Defendants created a duty to completely disclose details regarding the Phase II interim data is misplaced.  In *Shapiro*, the Third Circuit reasoned that making an affirmative statement about a material fact requires the declarant to speak truthfully about the subject.  *See Shapiro*, 964 F.2d at 282 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)).  Here, Defendants did not make an affirmative statement about the Phase II interim data, and therefore did not put the subject of the Phase II interim data "in play."  *Id.* Accordingly, Plaintiffs' assertions regarding the May 21 Press Release are unavailing as Plaintiffs have still failed to sufficiently allege that Defendants statements in the May 21 Press Release constituted a misstatement or omission of material fact. [1]

### 2.  June 17 Press Release

Plaintiffs assert in the SACC that the "statements contained in the June 17, 2008 Press Release were materially false and misleading when made because they failed to disclose the full truth concerning the negative Phase II interim Results and the negative Phase II Final Results." (SACC ¶ 92.)  Plaintiffs specifically argue in their brief that the following statements were false and misleading: (a) that the results of the Phase II trial of AAB-001 were encouraging; (b) that AAB-001 "appeared to have clinical activity in treating Alzheimer's disease," (c) that the "overall safety findings from this Phase II trial support their prior decision to move to Phase III studies," (d) that "preliminary analyses of the Phase II study are a continued validation of the amyloid approach to Alzheimer's disease," and (e) that "[t]hese results clinically support our decision to move into Phase III last year." (SACC ¶ 91, *see also* Pl.'s Opp'n Br. 23.)  Plaintiffs

---

[1] Plaintiffs' arguments regarding statements made on earnings calls and at conferences fail for the same reasons set forth herein.

argue that those statements are misleading because Defendants failed to disclose: (1) the "prevalence of "vasogenic edema among the study population **or the fact that it was just one of dozens of serious problems experienced by AAB-001 recipients, including brain bleeds**[,]" (2) "the manipulative manner in which the slight efficacy advantage in ApoE4 non-carriers was achieved, or the fact that . . . this slight efficacy advantage might be completely invalid on account of extreme variability seen in the data[,]"  (3) "the overwhelming percentage of patients that AAB-001 did not help, the variability and randomness of the data, or the complete lack of dose response." (SACC ¶ 92.)  Plaintiffs' argument mirrors its arguments in the FACC save for Plaintiffs' characterization of Defendants' statement as being false. (*See* FACC ¶ 91.)  Plaintiffs' arguments fail for the same reasons they did previously. Plaintiffs have failed to establish that Defendants had a duty to disclose the information at issue.[2]

### b. Insider Trading and Control Person Liability

Plaintiffs also bring a claim for insider trading pursuant to Section 20a and Section 20A of the Exchange Act.  To bring a viable claim under Section 20A for insider trading, "a plaintiff must plead a predicate violation of the Exchange Act." *In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 387 (D.N.J. 1999)(internal citations omitted).  Additionally, a plaintiff must allege: "(1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is

---

[2] This Court's decision is also supported by *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013).  The issue in *Kleinman* was whether omissions from a June 17, 2008 press release – the same one at issue in this case- describing the preliminary Phase II trial results for an Alzheimer's drug under development rendered the press release false or misleading to reasonable investors.  Plaintiff alleged that defendants knowingly failed to disclose the full magnitude of the overall negative Phase II trial results and duped him and other investors with an overly optimistic June press release. *Kleinman*, 706 F.3d at 152.  The Second Circuit, affirming the district court's decision, held that there was no actionable misstatement. *Id*. at 156.  While the June press release referred to top-line results and "encouraging preliminary findings" in a subgroup that may represent forty to seventy percent of the Alzheimer's population, the report also disclosed that the "overall study population" did not attain statistically significant results based on the primary endpoints." *Id*. at 153.  Accordingly, the Second Circuit held that omissions in the June 17 press release did not render the press release false or misleading to reasonable investors.

liable for an independent violation of the Exchange Act." *In re Advanta Corp. Sec. Litig.*, No. CIV.A. 97-4343, 1998 WL 387595 at * 9 (E.D.Pa. July 9, 1998), *aff'd*, 180 F.3d 525 (3d Cir. 1999) (*overruled on other grounds*).

"Section 20(a) creates liability . . . upon anyone who 'controls a person liable under any provision of' the Securities Exchange Act of 1934." *In re Cendant Corp. Litig.*, 60 F.Supp.2d at 379. "To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* (internal quotations omitted)).

Similar to these claims in the FACC, Plaintiffs' Section 20a and Section 20A claims in the SACC must be dismissed as the two sections require a predicate violation of the Exchange Act.

## V.     CONCLUSION

For the reasons stated above, this Court **GRANTS** Defendants' motion to dismiss.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties